# 12-3829-cv

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 12-3829-cv

UNITED STATES OF AMERICA, ex rel.,

*Plaintiff*,

KEVIN GRUPP, ROBERT MOLL,

*Plaintiff-Appellants*,

–v.–

DHL EXPRESS (USA), INCORPORATED, DHL WORLDWIDE EXPRESS, INCORPORATED, DHL HOLDINGS (USA), INCORPORATED

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

### BRIEF FOR DEFENDANTS-APPELLEES

TERRENCE M. CONNORS
JAMES W. GRABLE, JR.
CONNORS & VILARDO, LLP
*Attorney for Defendants-Appellees*
1000 Liberty Building
424 Main Street
Buffalo, NY 14202
(716) 852-5533

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
============================================

The United States of America
*ex. rel.*
Kevin Grupp and Robert Moll,

                          Plaintiffs-Appellants,

                    vs.

DHL Express (USA), Inc.; DHL Worldwide
Express, Inc. (former name of DHL Express (USA),
Inc.); and DPWN Holdings (USA),
Inc.; (f.k.a. DHL Holdings (USA), Inc.),

                          Defendants-Appellees.
============================================

**USCA Docket
No. 12-3829**

## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellees DHL Express (USA), Inc.; DHL Worldwide Express,

Inc. (former name of DHL Express (USA), Inc.); and DPWN Holdings (USA), Inc.;

(f.k.a. DHL Holdings (USA), Inc.), for their corporate disclosure statement pursuant

to Federal Rule of Appellate Procedure 26.1, state that Defendant DHL Express

(USA), Inc., is a wholly-owned subsidiary of Defendant DPWN Holdings (USA), Inc.,

which is itself a subsidiary of Deutsche Post, A.G. ("DPAG"), a company publicly

traded in Germany on the DAX. DPAG is not listed on any exchanges in the United

States. There is no such corporation as DHL Worldwide Express, Inc.

DATED:    Buffalo, New York
          January 14, 2013

                    /s/ Terrence M. Connors
          Terrence M. Connors, Esq.
          James W. Grable, Jr., Esq.
          **CONNORS & VILARDO, LLP**
          Attorneys for Defendants
            DHL Express (USA), Inc.;  DHL Worldwide
            Express, Inc. (former name of DHL Express
          (USA), Inc.; and DPWN Holdings (USA), Inc.;
            (f.k.a. DHL Holdings (USA), Inc.)
          1000 Liberty Building
          424 Main Street
          Buffalo, New York   14202
          (716) 852-5533
          tmc@connors-vilardo.com
          jwg@connors-vilardo.com

# TABLE OF CONTENTS

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF THE CASE...........................................................2

STATEMENT OF FACTS ..................................................................5

SUMMARY OF THE ARGUMENT ...............................................10

ARGUMENT ....................................................................................13

I. The District Court Properly Dismissed the Amended Complaint
Because Neither the United States Nor the Relators Satisfied
the Precondition of Contesting DHL's Bills Within 180 Days...........13

   A. The Notice Requirement of § 13710(a)(3)(B) Applies to
a Civil Action Commenced in an Article III Court. .................13

      1. Under the Plain Language of § 13710(a)(3)(B),
Satisfaction of the Notice Requirement Is a
Precondition to Commencing a Civil Lawsuit. ..............14

      2. The Surface Transportation Board Agrees that the
Notice Provision Applies to Civil Lawsuits. .................17

      3. Nearly Every Court to Address the Applicability of
the Notice Provision Has Agreed that It Is a
Prerequisite to Asserting a Federal Civil Claim. ............20

   B. The Notice Requirement of 49 U.S.C. § 13710(a)(3)(B)
Applies to FCA Claims...........................................................21

      1. The Terms of the FCA and § 13710(a)(3)(B) Do
Not Expressly Conflict, and Both Statutes Must
Therefore Be Given Effect. ...........................................22

      2. To the Extent the Statutes Conflict, the Specific
Provisions of § 13710(a)(3)(B) Control. .......................27

      3. An Agency of the United States Is a "Shipper"
Within the Scope of § 13710(a)(3)(B)............................28

      4. A Claim Asserted Under the FCA Is a "Contest"
Within the Scope of § 13710(a)(3)(B)............................31

   C. The 180-Day Notice Period Is Not Tolled Under the
Wartime Suspension of Limitations Act...................................33

i

D.    The 180-Day Notice Period Is Not Subject to Equitable Tolling. ...................................................................35

E.    Jim Ball's Letter to Defendants Does Not Satisfy § 13710(a)(3)(B). ...........................................................37

II.    Relators Have Failed to Plausibly Allege that DHL Knowingly Submitted False Claims. ................................................40

A.    DHL's Contract Documents Clearly Provide for the Imposition of the Fuel Surcharges at Issue. ...........................42

B.    DHL's Interpretation of the Governing Contractual Documents Is Plausible and Objectively Reasonable and, Thus, as a Matter of Law, Cannot Support an FCA Claim. ..............................................................50

III.    Relators Have Failed to Plead their Claims With Particularity. .........55

IV.    Relators' Claims Are Partially Time-Barred. ....................................58

CONCLUSION .................................................................................60

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................ 42

*Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067 (2d Cir. 1993) ...................................... 33

*Avery Dennison Corp. v. Con-Way Transp. Servs., Inc.*, No. 2005-L-218,
2006 WL 3350761 (Ohio Ct. of App., Nov. 17, 2006) ........................................ 21

*Belot v. Burge*, 490 F.3d 201 (2d Cir. 2007) .......................................................... 37

*Carolina Traffic Services of Gastonia, Inc. – Petition for Declaratory
Order (“CTS”)*, No. 41689, 1996 WL 303722 (STB, May 31, 1996) ............... 17

*Cerdant, Inc. v. DHL Express (USA), Inc.*, No. 2:08-cv-186, 2010 WL
3397501 (S.D. Ohio, Aug. 25, 2010) .................................................................. 21

*Cf. Mohamad v. Palestinian Auth.*, ___ U.S. ___, 132 S. Ct. 1702 (2012) ............. 30

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ............................... 42

*Cherry v. City of New York*, 381 Fed. Appx. 57 (2d Cir. 2010) ............................. 36

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467
U.S. 837 (1984) ...................................................................................... 18, 19, 20

*CSX Transp., Inc. v. Al. Dep’t of Revenue*, ___ U.S. ___, 131 S. Ct. 1101
(2011) .................................................................................................................. 14

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) ..................... 42, 43

*Feick v. Fleener*, 653 F.2d 69 (2d Cir. 1981) ........................................................ 42

*Freeman v. Celebrity Cruises, Inc.*, Nos. 94-cv-5270, 94-cv-5473, 94-
cv-5546, 1994 WL 689809 (S.D.N.Y. Dec. 8, 1994) ......................................... 38

*Galli v. Metz*, 973 F.2d 145 (1992) ....................................................................... 48

*Gold v. Morrison-Kudsen Co.*, 68 F.3d 1475 (2d Cir. 1995) ................................ 55

*Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996) ............. 52

*Harper v. Ercole*, 648 F.3d 132 (2d Cir. 2011) ........................................37

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999).....................................................................................................54

*Hinck v. U.S.*, 550 U.S. 501 (2007)........................................................27

*In re Apex Exp. Corp.*, 190 F.3d 624 (4th Cir. 1999) ..............................21

*Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89 (1990) ............................36

*J.E.M. AG Supply, Inc. v. Pinoneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001).......................................................................................................23

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009)....................45

*Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Express (USA), Inc.*, No. 08-cv-761, 2012 WL 370319 (W.D.N.Y., Feb. 3, 2012) ............................21, 38, 40

*Johnson v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259 (W.D.N.Y. 2010) ............................................................................57

*Kasten v. Saint-Goblin Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325 (2011) .....................................................................20

*Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332 (11th Cir. 1984).............38

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986)........................................58

*Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc.*, 350 F. Supp. 2d 686 (D. Md. 2004) ............................................................................21

*Mathirampuzha v. Potter*, 548 F.3d 70 (2d Cir. 2008) ...........................19

*Morton v. Mancari*, 417 U.S. 535 (1974) ...................................22, 23, 24

*Nancy Hall v. Aloha Int'l Moving Servs., Inc.*, No. 42048, 2001 WL 251330 (STB, Mar. 9, 2001) ...............................................................18

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005)..................................................................................18

iv

*National Association of Freight Transportation Consultants, Inc. – Petition for Declaratory Order ("NAFTC")*, No. 41826, 1997 WL 189658 (STB, Apr. 9, 1997) ........................................................ 17

*Pearl v. City of Long Beach*, 296 F.3d 76 (2d Cir. 2002) ........................................... 36

*Rainwater v. United States*, 356 U.S. 590 (1958) ...................................................... 28

*Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017 (2d Cir. 1985) ............... 48

*S.E.C. v. McCarthy*, 322 F.3d 650 (9th Cir. 2003) .................................................. 30

*Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007) .................... 54

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...................................................... 20

*Tanguchi v. Kan Pacific Saipan, Ltd.*, ___ U.S. ___, 132 S. Ct. 1997 (2012) ..................................................................................................... 16, 29, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..................... 42

*United States ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007) ........................................................................................ 57

*United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931 (10th Cir. 2008) ......... 53

*United States ex rel. Butler v. Hughes Helicopter, Inc.*, 71 F.3d 321 (9th Cir. 1995) ...................................................................................................... 52

*United States ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407 (4th Cir. 2010) ............................................................................................................. 53

*United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186 (8th Cir. 2010) .................................................................................................. 51

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980 (D.C. Cir. 2008) ................................................................................ 52

*United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999) ........................................................................................................ 52

*United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980 (10th Cir. 2005) ................................................................................53

*United States ex rel. Owens v. First Kuwati Gen. Trading & Contracting Co.*, 612 F.3d 724 (4th Cir. 2010) .............................................52, 54

*United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951 (8th Cir. 2012) .......................................................51

*United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288 (4th Cir. 2008) ................................................................................34

*United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58 (D. Conn. 2006) ........................................................................................57

*United States ex rel. Swafford v. Borgess Med. Ctr.*, 24 F. App'x 491 (6th Cir. 2001) ................................................................................52

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008) ...................................................51, 52, 53

*United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818 (7th Cir. 2011) ............................................................................51, 53

*United States v. Anghaie*, No. 1:09-cr-37, 2011 WL 72004 (N.D. Fla., Feb. 21, 2011) ......................................................................34, 35

*United States v. Basin Elec. Power Coop.*, 248 F.3d 781 (8th Cir. 2001)...............52

*United States v. Borden Co.*, 308 U.S. 188 (1939)................................................23

*United States v. Latimer*, No. cr-11-384, 2012 WL 1023569 (W.D. Ok., Mar. 27, 2012) ........................................................................34

*United States v. Mason*, 692 F.3d 178 (2d Cir. 2012) ............................................29

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968)........................................27

*United States v. Pfluger*, 685 F.3d 481r (5th Cir. 2012)..........................................35

*United States v. Science Apps. Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010) ........................................................................................54

*United States v. Shelton*, 816 F. Supp. 1132 (W.D. Tx. 1993) ................................. 35

*United States v. Southland Mgmt. Corp.*, 326 F.3d 669 (5th Cir. 2003) ................. 52

*United States v. The Baylor Univ. Med. Ctr.*, 469 F.3d 263 (2d Cir. 2006) ........................................................................................... 59

*United States v. Western Titanium, Inc.*, No. 08-cr-4229, 2010 WL 2650224 (S.D. Ca., Jul. 1, 2010) ........................................................... 35

*United States. ex rel. Farmer v. City of Houston*, 523 F.3d 333 (5th Cir. 2008) ........................................................................................... 52

*Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ............................................................................................ 27

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2d Cir. 1990) ............................... 58

*Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744 (2d Cir. 2009) ........................................................................................... 56

*Wood v. Milyard*, ___ U.S. ___, 132 S. Ct. 1826 (2012) ................................. 33, 58

*Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74 (2d Cir. 2003) ........................................................................................... 36

**Statutes**

15 U.S.C. § 1681m(a) ......................................................................................... 73

18 U.S.C. § 3287 ...................................................................................... 41, 42, 43

31 U.S.C. § 3729 ................................................................................................. 10

31 U.S.C. § 3729(a)(1)(A) .............................................................................. 56, 70

31 U.S.C. § 3729(a)(1)(C) .................................................................................... 56

31 U.S.C. § 3730 .............................................................................. 11, 30, 50, 51

31 U.S.C. § 3730(b)(2) ................................................................................... 30, 33

vii

31 U.S.C. § 3731(b) ...................................................................29, 44, 81, 83

31 U.S.C. § 3731(c) ...................................................................................82

49 U.S.C. § 13102 ......................................................................................36

49 U.S.C. § 13710(a)(3)(B) ...............................................................passim

49 U.S.C. § 14104 ................................................................................36, 38

49 U.S.C. § 14704(a)(2) ......................................................................25, 26

49 U.S.C. § 14710(a) ..................................................................................38

49 U.S.C. § 14711(a) ..................................................................................38

49 U.S.C. § 14901(d)(1) .............................................................................38

49 U.S.C. § 721(a) ......................................................................................21

49 U.S.C. §§ 13702(c)(3) ...........................................................................38

Fed. R. Civ. P. 9(b) ....................................................................................75

## STATEMENT OF ISSUES

1.      When a statute requires that a shipping customer "must contest the

original bill or subsequent bill within 180 days of receipt of the bill in order to

have the right to contest such charges"; the customer is aware of the charges and

the basis for their imposition at the time they are assessed and paid; and the

customer nevertheless fails to contest the charges within the 180-day statutory

period, can a party still "contest" the charges?


2.        Have relators successfully stated an FCA claim for falsely

causing the Government to pay fuel surcharges for shipments that did not travel by

air, when the contract documents upon which the relators rely disclosed the truth

about the surcharges and advised the Government that the shipments might not

travel by air?


3.        If relators fail to plead a fraud claim with the particularity

required by FRCP 9(b), should that claim be dismissed?


4.        If relators bring untimely claims after the expiration of the

statute of limitations in the FCA, must those FCA claims be dismissed as

untimely?

1

## STATEMENT OF THE CASE

DHL delivered packages for the United States, and at the time of the delivery of those packages, the documents associated with the shipments informed the United States that there would be fuel surcharges on those shipments. The documents also disclosed to the United States that the fuel surcharges would be calculated and owed depending upon the type of delivery service the Government selected, and that shipments the Government sent by "Air Express" might travel by ground. DHL disclosed and did not conceal that even for those "Air Express" shipments that traveled by ground, the fuel surcharges applicable to "Air Express" packages was still owed.

The Government paid these fuel surcharges at the time it made these shipments. To this day, the United States has never alleged that the fuel surcharges were fraudulent, and the United States has never contested the applicability of the surcharges or suggested that DHL's shipping documents concealed the surcharges or misled the Government.

Plaintiffs-Appellants Kevin Grupp and Robert Moll (hereinafter "relators") filed this *qui tam* action under the FCA seeking damages for the imposition of the fuel surcharges against the United States. Relators allege that DHL defrauded the United States by charging jet fuel surcharges on shipments within the "Air Express" service category, because some of those shipments travelled by ground

2

and not in an airplane. To assert this claim, relators ignore the language on the shipping documents that informed the United States that "Air" shipments might travel by ground. The Government has declined to intervene in relators' FCA case, so they amended their complaint and proceeded below on their own.

Relators' claims fail for a number of independent reasons.

Most basically, they fail because DHL made no false claim. DHL disclosed to its customers – including the United States – that fuel surcharges would be imposed depending upon the category of delivery service the customer selected, and that "Air" shipments might travel by ground and "Ground" shipments might travel by air. Relators ignore those disclosures DHL made to its customers, but they are fatal to relators' claims.

In addition, as the court below concluded, relators failed to satisfy a statutory notice requirement designed to give DHL and other common carriers the opportunity to dispute allegations that they overcharged their customer. This 180-day notice requirement was breached by relators, who assert on appeal the alternative arguments that the statute does not apply and if it applies it should be tolled. The federal agency that administers government shipping, the Surface Transportation Board (STB), disagrees with relators about the meaning and impact of the 180-day notice requirement, so relators allege that the STB is wrong too. But the STB – and the court below – are correct about the meaning of the 180-

3

notice precondition and its impact on relators' claims. Relators breached that statutory precondition, and this Court should affirm the district court's decision on that basis alone.

There are additional reasons why relators' claims fail, including their failure to plead their fraud claim with sufficient particularity and their breach of the statute of limitations applicable to FCA claims. These provide additional bases to affirm the district court's decision dismissing relators' amended complaint.

## STATEMENT OF FACTS

Defendant-appellee DHL Express (USA), Inc., is a shipping company that transports packages by motor vehicle and airplane.  (J.A. 52.)  DHL Express is a registered motor carrier.  (J.A. 47.)  Defendant-appellee DHL Worldwide Express, Inc., is a former name of DHL Express.  (J.A. 53.)  There is no longer any such corporation.  (J.A. 53.)  Defendant-appellee DHL Holdings (USA), Incorporated is a wholly-owned subsidiary of parent company DPWN Holdings (USA), Inc.  (J.A. 53.) Defendants are three separate and distinct entities but, for purposes of this brief, are referred to collectively as "DHL."

DHL provides retail shipping services to the general public in accordance with published terms of service.  (J.A. 53.)  During the period implicated by relators' amended complaint – "at least 2003 to 2008" – DHL contracted to provide retail shipping services to various federal agencies.  (J.A. 34, 37.)  Under its contracts with the federal government, DHL offered a number of different categories of shipping services defined in DHL's Standard Rate Guide.  (J.A. 53, 59.)

For purposes of this litigation, the pertinent DHL delivery service categories included "Same Day," "Next Day," "2nd Day,"[1] and "Ground."  (J.A. 53, 59.)  The

---

[1] The "Next Day" category had sublevels of service depending on the requested time of delivery.  (J.A. 59.)

5

"Same Day," "Next Day," and "2nd Day" services fall within the category of "Air Express Services." (J.A. 53.)

A waybill was used with each DHL shipment. (*See* J.A. 53, 96-100, 105-09.) Regardless of the category of service category the customer selected – "Air Express" or "Ground" – the waybill for each and every shipment disclosed to the customer that shipments "may be carried by any means DJL chooses, including air, road or any other carrier." (J.A. 97, 106.) In other words, DHL disclosed to its customers, including the United States, that "Air Express" shipments may travel by ground, and that "Ground" shipments may travel by air.

"Ground Delivery Service" was the less expensive shipment service category for packages where delivery was not as urgent. (*See* J.A. 59.) DHL promoted this service as providing an opportunity to "[s]ave money on your routine shipments with guaranteed door-to-door delivery in 1 to 6 business days, depending on the origin and destination of your shipment." (J.A. 92.) The waybill for Ground Delivery Service shipments disclosed that shipments delivered by the Ground Delivery Service "may be carried by any means DHL chooses, including air, road or any other carrier." (J.A. 97.) The fact that a shipment was sent by Ground Delivery Service did not mean that it would necessarily travel by ground. (*Id.*) Rather, Ground Delivery Service was a class of delivery service offered by DHL, not a description of the method or mode of transportation. (*Compare* J.A.

6

59, 92 (DHL's rate guide, describing classes and categories of service, including "Ground") *with* J.A. 97 (waybill disclosing that "Ground" shipments might not travel by ground).)

DHL's terms of service disclosed a specific fuel surcharge applicable to "Ground" shipments, which was less than the fuel surcharge applicable to DHL's more expedited "Next" and "2nd Day" categories. (*See* J.A. 85, 90, 102-03.) This fuel surcharge was imposed on all Ground Delivery shipments, regardless of the actual method of transportation. (*See* J.A. 90, 102-03.) The fact that this surcharge would be assessed on all "Ground" shipments was disclosed to DHL's customers, and customers were advised how to calculate the surcharge they would incur. (*See id.*) The precise surcharge for a shipment was disclosed to customers on the fuel surcharge tables posted on DHL's website. (*See* J.A. 102-03.)

In addition to "Ground Delivery Service," DHL also offered a series of more expensive but more expedient delivery services, known as "Air Express Services." (*See* J.A. 53, 59, 90.) DHL's "Air Express Services" included "Same Day," "Next Day," and "2nd Day" Services. (*See id.*) Just as the waybill used for "Ground" disclosed that shipments may not necessarily travel by ground, so too the waybill used for "Next Day" and "2nd Day" – that is, "Air Express Services" shipping – disclosed to customers that shipments delivered in these service categories "may be carried by any means DHL chooses, including air, *road* or any other carrier." (*See*

7

J.A. 106 (DHL's waybill for these service categories) (emphasis added).)  In other words, DHL's customers were expressly informed that the fact that a shipment was sent using the "Air Express" shipping category did not mean the shipment would necessarily travel by air.  (*See* J.A. 106.)  Rather, Air Express Services were classes of delivery service offered by DHL, not a description of the method or mode of transportation.  (*Compare* J.A. 59, 92 (DHL's rate guide, describing classes and categories of service, including "Next Day" and "2nd Day" services) *with* J.A. 106 (waybill disclosing that these shipments might travel by ground and not by air).)

DHL disclosed a specific fuel surcharge applicable to shipments within the "Air Express" categories, which was higher than the fuel surcharge rate applicable to the less-expedited Ground Delivery Service.  (*See* J.A. 85, 90, 102-03.)  This fuel surcharge was imposed on all Air Express shipments other than "Same Day," regardless of the actual means of transportation.  (*See* J.A. 85, 90, 102-03.)  The fact that this surcharge would be assessed on all "Air Express" shipments was disclosed to DHL's customers, and customers were advised how to calculate the surcharge they would incur.  (*See* J.A. 90, 102-03.)  The precise surcharge for a shipment was disclosed to customers on the fuel surcharge tables posted on DHL's website.  (*See* J.A. 102-03.)

8

DHL did not conceal the existence of the fuel surcharges or misstate their applicability. (*See generally* J.A. 85, 90, 102-03.) Instead, DHL provided its customers – including the United States – with honest disclosure of the existence of the surcharges and the method by which they would be calculated and assessed. (*See generally id.*) DHL advised its customers – including the United States – that the fuel surcharges are "applicable to all DHL products, except for the following services: DHL Same Day, DHL Global Forwarding, DHL Global Mail and DHL Solutions." (J.A. 102.)

Similarly, DHL did not conceal that packages shipped by "Air Express" might travel by ground, or that packages shipped by "Ground" might travel by air. (*See* J.A. 97, 106.) Customers – including the United States – were provided with honest disclosure of the possibility that shipments sent by "Air Express" might travel by ground, and that shipments sent by "Ground" might travel by air. (*See id.*)

# SUMMARY OF THE ARGUMENT

## ISSUE ONE

Relators assert that a statute which requires shipping customers to "contest the original bill or subsequent bill within 180 days of the receipt of the bill in order to have the right to contest those charges" does not apply to their lawsuit contesting the imposition of fuel surcharges on shipments DHL transported for the United States. Despite the fact that the federal agency that oversees government shipping, the STB, agrees that the statute applies in this circumstance, relators insist that litigation disputing the validity of the surcharges does not constitute "contesting" the incurred surcharges. This strained interpretation of the 180-day notice provision is at odds with: the plain meaning of the statute and the verb "contest"; the STB's interpretation of the statute it is charged with executing; and sound precedent of several courts that have considered the issue. The court below correctly concluded that the statute applies and that relators failed to comply with its precondition to suit, and this Court should affirm the district court's dismissal on that basis.

Relators argue that the 180-day notice precondition does not apply to claims brought under the FCA, and as a consequence, their failure to comply with the 180-day requirement is of no moment. This argument is unavailing because the two statutes are complementary and do not conflict, so that they can and must be

10

read in concert. To the extent that the United States, in its *amicus* brief, argues that the United States is not a "shipper" and that an FCA claim does not constitute "contesting" the charges, these contentions are refuted by the statutes themselves and by relators' claims, which most assuredly involve relators' "contesting" the validity of the fuel surcharges.

Relators argue that, in the event the statute applies, the 180-day requirement was tolled because of war, or should be tolled on equitable tolling grounds. But the 180-day statutory requirement is not a statute of limitations that can be tolled. It is a precondition to suit. And in any event, the statute providing for a toll of statutes of limitations during wartime does not apply, and there is no basis to invoke the doctrine of equitable tolling.

## ISSUE TWO

Relators' claim that DHL defrauded the United States is premised upon relators' assertion that DHL assessed fuel surcharges deceptively. Specifically, relators assert that DHL assessed jet fuel surcharges on shipments that did not travel in airplanes. To assert these claims, relators rely upon the DHL contract documents imposing these fuel surcharges.

These same documents, however, disprove relators' claims and entitle DHL to dismissal. They disclosed to the United States that fuel surcharges would be

11

imposed depending upon the category of delivery service the Government selected, and that "Air" shipments might travel by ground and not in an airplane. Relators' brief ignores these disclosures, but they are fatal to relators' assertion that DHL defrauded the government.

## ISSUE THREE

Relators pleaded their original complaint without any of the particularity required by Federal Rule of Civil Procedure 9(b). When the United States elected not to intervene and the complaint was unsealed, relators amended their complaint to add three examples of shipments that might ("upon information and belief") have included the disputed surcharges. The amended complaint added no additional particularity about the time span of the alleged fraud, the shipments at issue, or any of the other particularity required by Rule 9(b). This absence of sufficient particularity is an independent additional defect necessitating dismissal.

## ISSUE FOUR

Relators allege that the shipments at issue took place sometime between 2003 and 2008. Claims premised upon shipments that took place before September 9, 2005, are untimely as a matter of law because they are outside the statute of limitations applicable to the FCA.

## ARGUMENT

I.   **THE DISTRICT COURT PROPERLY DISMISSED THE AMENDED COMPLAINT BECAUSE NEITHER THE UNITED STATES NOR THE RELATORS SATISFIED THE PRECONDITION OF CONTESTING DHL'S BILLS WITHIN 180 DAYS.**

The district court dismissed relators' claims because relators failed to satisfy the 180-day notice requirement of 49 U.S.C. § 13710(a)(3)(B).  This Court should affirm that determination.

### A.   **THE NOTICE REQUIREMENT OF § 13710(A)(3)(B) APPLIES TO A CIVIL ACTION COMMENCED IN AN ARTICLE III COURT.**

The clear and unambiguous terms of 49 U.S.C. § 13710(a)(3)(B) specify that a party seeking to contest a motor carrier's shipping charges must give the carrier notice of the dispute within 180 days of receiving the bill at issue.  Relators assert that this notice provision does not apply to civil lawsuits.  But the plain language of the statute, the determination of the agency charged with enforcement (the STB), and the decisions of nearly every court to consider the issue contradict relators' contention and support the conclusion that satisfaction of this notice requirement is a necessary precondition to a civil lawsuit contesting the charges at issue.[2]

---

[2] Notably, although the United States contends that the 180-day notice requirement does not apply in the context of the False Claims Act, it has not joined in relators' argument that the notice requirement does not generally apply to other civil lawsuits.

1.   **UNDER THE PLAIN LANGUAGE OF § 13710(A)(3)(B), SATISFACTION OF THE NOTICE REQUIREMENT IS A PRECONDITION TO COMMENCING A CIVIL LAWSUIT.**

In considering the scope of § 13710(a)(3)(B), "[w]e begin, as in any case of statutory interpretation, with the language of the statute." *See CSX Transp., Inc. v. Al. Dep't of Revenue*, ___ U.S. ___, 131 S. Ct. 1101, 1107 (2011). Here, the terms of § 13710(a)(3)(B) are unambiguous and leave no question as to its applicability in the context of civil lawsuits. Indeed, the statute clearly indicates that *whenever* a shipper intends to a contest a bill, it must provide notice within 180 days:

> A shipper must contest the original bill or subsequent bill within 180 days of receipt of the bill in order to have the right to contest such charges.

§ 13710(a)(3)(B). These clear and unambiguous terms of § 13710(a)(3)(B) include no limitation on the manner of the contest. The statute does not restrict the notice requirement to STB hearings. It does not carve out fraud or FCA claims. Its applicability is not limited in any way.

Relators argue that the first sentence of § 13710(a)(3)(B) limits the applicability of the 180-day provision to only STB hearings (Rltrs.' Br. 25-26), but relators' argument is directly contradicted by the text itself. The section reads in its entirety:

> If a shipper seeks to contest the charges originally billed or additional charges subsequently billed, the shipper may request that the Board determine whether the charges billed must be paid. A shipper must contest the

> original bill or subsequent bill within 180 days of receipt
> of the bill in order to have the right to contest such
> charges.

§ 13710(a)(3)(B).  Contrary to relators' assertions, the first sentence of this section

is not intended to limit this section's applicability; rather, it is meant to expand it.

Under this first sentence, Congress authorizes the STB to hear a shipper's dispute

of a motor carrier's bill.  *See id.*  But this section does not *require* that a shipper

contest charges before the STB; it only says that a shipper *may* do so.  *See id.*  The

obvious alternative is that the shipper may contest the charges in a court of law.

Nor is there anything in the second sentence of § 13710(a)(3)(B), *i.e.* the

180-day notice provision, that limits that sentence to the latter clause of the first

sentence, *i.e.* the statute's grant of authority to the STB to hear the dispute.  Had

Congress intended to limit the notice provision to STB hearings, it would have

included language in the second sentence – such as "In that case" – tying it to the

second clause of the first sentence.  Instead, the second sentence and the second

clause of the first sentence are parallels describing a shipper's options and duties if

it wants to contest a motor carrier's charges.  Indeed, if the order of the second

sentence and the second clause of the first sentence were switched, the section

would still make sense; that would not be the case if Congress had intended to limit

the second sentence (the notice provision) to the conditions of the second clause of

the first sentence (the STB's authority to hear disputes).

Furthermore, Congress's use of the word "contest" in the second sentence indicates that the sentence is not limited to requests to the Board. "Contest" is not defined in Part B of Subtitle IV of Title 49, so we look to the typical meaning of the word. *See Tanguchi v. Kan Pacific Saipan, Ltd.*, ___ U.S. ___, 132 S. Ct. 1997, 2002 (2012). The common usage of "contest" is, of course, very broad, and when used, as here, as a transitive verb, it means "to make the subject of dispute, contention, or *litigation*." *See* Merriam-Webster (emphasis added).

Any other reading of § 13710(a)(3)(B) would defeat the purpose of Congress's enactment of that section. As the Government has noted, Congress's intention in enacting the predecessor statute to § 13710 was to utilize the specialized knowledge and expertise of the Interstate Commerce Commission ("ICC," the STB's predecessor) to more efficiently resolve disputes regarding the reasonableness and applicability of motor carriers' rates. (*See* Gov't Br. 25.) Imposing a 180-day notice requirement on cases brought before the ICC (or STB) but not cases brought before courts of law would only deter – and, in some cases, prevent – parties from utilizing the ICC (or STB), and would steer them to the courts instead. That, of course, would make the grant of authority to the ICC (or STB) to hear shipping disputes essentially meaningless and could not possibly have been what Congress intended in establishing the 180-day requirement. Thus, the only plausible reading of § 13710(a)(1)(B) is that the 180-day notice

16

requirement applies to all shipping disputes, regardless of whether they are brought before the STB or a court of law.

### 2. THE SURFACE TRANSPORTATION BOARD AGREES THAT THE NOTICE PROVISION APPLIES TO CIVIL LAWSUITS.

Relators' construction of the statute is contrary to that of the STB, the agency charged with enforcing and regulating Subtitle IV of Title 49 of the U.S. Code (which includes § 13710).  And to the extent that there is any uncertainty in the plain language of § 13710(a)(1)(B), it is conclusively resolved by the STB's repeated and consistent affirmation that the 180-day notice requirement also applies to civil lawsuits.

In *Carolina Traffic Services of Gastonia, Inc. – Petition for Declaratory Order ("CTS")*, No. 41689, 1996 WL 303722 (STB May 31, 1996), the STB held that the 180-day notice requirement of the statute applies *whenever* a shipper disputes a motor carrier's bills, *even when the claim is brought before a court of law instead of the STB*:  "[P]roviding notice to the other party within the statute's 180-day period is a precondition for pursuing a claim, whether the moving party chooses to pursue that claim initially at the Board or in court."  *Id.* at *3.

The following year, the Board again considered the issue in *National Association of Freight Transportation Consultants, Inc. – Petition for Declaratory Order ("NAFTC")*, No. 41826, 1997 WL 189658 (STB Apr. 9, 1997).  The Board reaffirmed its determination that the 180-day notice requirement applies to *all*

contests of a motor carrier's charges, regardless of whether they brought before the Board or an Article III court. *Id.* at *4-5. The Board further held that the 180-day notice requirement applies to all types of claims arising from a motor carrier's charges "*without limitation as to the nature of the claim*." *Id.* at *4 (emphasis added).

In more recent years, the STB has continued to consistently apply the notice requirements to actions commenced in court. *See, e.g., Petition for Declaratory Order – Nancy Hall v. Aloha Int'l Moving Servs., Inc.*, No. 42048, 2001 WL 251330, at *3 (STB Mar. 9, 2001) (On referral from a federal district court in connection with the respondents' motion to dismiss based on the petitioner's failure to comply with the 180-day notice requirement, the STB confirmed that the petitioner had provided adequate notice within the requisite 180-day period.).

Under the Supreme Court's landmark decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the STB's interpretation is conclusive and binding on this Court. As *Chevron* dictates, an agency possesses the authority to reasonably interpret statutes where ambiguities exist in the statutes regulated and enforced by that agency. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). As the Court reasoned, filling such gaps "involves difficult policy choices that agencies are better equipped to make than courts." *Id.* Accordingly, as long as a statute is

18

ambiguous and the agency's interpretation reasonable, "*Chevron* requires a federal court to accept the agency's construction of the statute, *even if the agency's reading differs from what the court believes is the best statutory interpretation*." *Id.* (emphasis added). And, as this Court has noted, the deference owed to an agency's interpretation of the statutes it administers includes its interpretation of "the scope of those statutes and the types of claims they cover." *Mathirampuzha v. Potter*, 548 F.3d 70, 82 (2d Cir. 2008).

Here, Congress granted the STB the authority to "carry out" subtitle IV of Title 49 of the U.S. Code (which includes § 13710), and to "prescribe regulations in carrying out" subtitle IV. *See* 49 U.S.C. § 721(a). Accordingly, to the extent there is any ambiguity about the scope of § 13710(a)(3)(B), the STB's determination regarding its applicability to civil lawsuits is consistent with the letter and spirit of the statute and therefore is binding upon this Court.

Relators (Rltrs.' Br. 28) and the United States (Gov't Br. 28-29) contend that *Chevron* deference to the STB's interpretation of § 13710(a)(3)(B) is inappropriate because the Board did not intend to bind courts. But their reliance on a brief excerpt from the STB's opinion in *NAFTC* is misplaced. In stating that it intended only to "provide guidance," the STB merely was emphasizing that "it is ultimately up to the courts to apply the 180-day rule in individual cases." *See NAFTC*, 1997 WL 189658, at *4. The STB was not suggesting that it did not intend to bind

19

courts with its decision; to the contrary, it merely was acknowledging that only the courts can ultimately ensure compliance with the notice requirement. *See CTS*, 1996 WL 303722, at *3 ("A court action is needed to enforce the Board's determination should the other party not acquiesce in the Board's conclusion.").

Furthermore, even if the STB's determination is not entitled to conclusive *Chevron* deference, the STB's interpretation of § 13710(a)(3)(B) is well-reasoned and consistent with the letter and spirit of the statute and sound common sense. As its opinions reflect, the STB has carefully considered the interests of all relevant parties – individual petitioners, carriers, and shippers – and it has consistently reaffirmed and applied its interpretation. Accordingly, that interpretation of the scope of § 13710(a)(3)(B) is, at minimum, entitled to substantial deference. *See, e.g., Kasten v. Saint-Goblin Performance Plastics Corp.*, ___ U.S. ___, 131 S. Ct. 1325, 1335 (2011); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

### 3. NEARLY EVERY COURT TO ADDRESS THE APPLICABILITY OF THE NOTICE PROVISION HAS AGREED THAT IT IS A PREREQUISITE TO ASSERTING A FEDERAL CIVIL CLAIM.

In addition to the clear and unequivocal terms of § 13710(a)(3)(B) and the STB's reasoned interpretation of the statute, nearly every court to address the issue has agreed that the notice requirement applies to federal civil claims, such as the claims at issue here. In addition to the district court's ruling below, the district court also carefully considered the scope of § 13710(a)(3)(B) in *Jim Ball Pontiac-*

20

*Buick-GMC, Inc. v. DHL Express (USA), Inc.*, No. 08-cv-761, 2012 WL 370319 (W.D.N.Y., Feb. 3, 2012), a putative class action involving the same DHL fuel surcharges at issue here. In that case, the district court ruled, as it did in the case below, that the 180-day notice requirement is applicable to actions brought before a court. *See id.* at *3. The courts in *Cerdant, Inc. v. DHL Express (USA), Inc.*, No. 2:08-cv-186, 2010 WL 3397501, at *5-6 (S.D. Ohio Aug. 25, 2010), and *Avery Dennison Corp. v. Con-Way Transp. Servs., Inc.*, No. 2005-L-218, 2006 WL 3350761, at *4-5 (Ohio Ct. App. Nov. 17, 2006), agree. Likewise, the Fourth Circuit has acknowledged, in dicta, the applicability of 180-day notice requirement to actions brought before a court. *See In re Apex Exp. Corp.*, 190 F.3d 624, 641 n.24 (4th Cir. 1999). This precedent is persuasive and well-reasoned, and relators have failed to refute it.[3]

### B. THE NOTICE REQUIREMENT OF 49 U.S.C. § 13710(A)(3)(B) APPLIES TO FCA CLAIMS.

While the United States has declined to intervene in the present action or to address the general applicability of the 180-day notice requirement to civil actions

---

[3] Relators' reliance on *Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc.*, 350 F. Supp. 2d 686 (D. Md. 2004), and *Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*, No. 11-cv-31310, 2012 WL 4049955 (S.D.N.Y Sept. 14, 2012), is misplaced. The *Mastercraft* court merely held that § 13710(a)(3)(B) did not apply to *state law* causes of action. *See* 350 F. Supp. 2d at 693. *Grocery Haulers* reflects a fundamental misunderstanding of § 13710(a)(3)(B) and is erroneous for the same reason that the Government's arguments fail here. *See* 2012 WL 40449955, at *11.

commenced in a court of law, the United States has submitted an *amicus* brief addressing the specific issue of whether § 13710(a)(3)(B) applies to claims under the FCA. Because § 13710(a)(3)(B) does not conflict with the provision of the FCA and because § 13710(a)(3)(B) is intended to cover *all* contests of a motor carrier's charges, regardless of the forum or form of the claim, the 180-day notice requirement applies even in the context of an FCA claim.

### 1. THE TERMS OF THE FCA AND § 13710(A)(3)(B) DO NOT EXPRESSLY CONFLICT, AND BOTH STATUTES MUST THEREFORE BE GIVEN EFFECT.

The United States argues that the district court's application of the 180-day notice requirement in this context conflicts with the FCA's statute of limitations and sealing provisions. (Gov't Br. 12.) But the Government's argument does not survive scrutiny because the express terms of § 13710(a)(3)(B) and the FCA do not conflict.

One of the central canons of statutory interpretation is that whenever two statutes can possibly be read to co-exist, a court must interpret them so as to give each of them effect. As the Supreme Court has long held, "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *See, e.g., Morton v. Mancari*, 417 U.S. 535, 551 (1974); *accord J.E.M. AG Supply, Inc. v.*

22

*Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001). In other words, "[w]hen there are two acts upon the same subject, the rule is to give effect to both if possible." *Morton*, 417 U.S. at 551 (quoting *U.S. v. Borden Co.*, 308 U.S. 188, 198 (1939)).

Here, the United States argues that application of the 180-day notice requirement in the context of the FCA undermines and conflicts with the FCA's statute of limitations and sealing requirements. (Gov't Br. 12.) But, as the Government ultimately concedes, "[t]here is no 'irreconcilable conflict' between the FCA and Section 13710." (Gov't Br. 19.) Accordingly, under well-established Supreme Court precedent, this Court must give effect to both statutes.

First, § 13710(a)(3)(B) does not conflict with the FCA's statute of limitations, 31 U.S.C. § 3731(b), because the 180-day notice requirement of § 13710(a)(3)(B) is *not* a statute of limitations. *See NAFTC*, 1997 WL 189658, at *5; *CTS*, 1996 WL 303722, at *2. Rather it is a notice requirement, a legal requirement separate and distinct from a statute of limitations. *See NAFTC*, 1997 WL 189658, at *5; *CTS*, 1996 WL 303722, at *2. In fact, as the STB has repeatedly emphasized, the enactment of § 13710(a)(3)(B) "did not purport to alter the time limit for bringing a court action." *CTS*, 1996 WL 303722, at *2; *accord NAFTC*, 1997 WL 189658, at *5. Thus, the 180-day notice requirement of

23

§ 13710(a)(3)(B) has absolutely no effect on the FCA's statute of limitations, and the two provisions can – and must – be interpreted to co-exist.

Nor does § 13710(a)(3)(B) conflict with the FCA's sealing provision, 31 U.S.C. § 3730(b)(2), which requires that a "complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." *See* 31 U.S.C. § 3730(b)(2). The sealing provision prohibits the disclosure of the existence and nature of the *complaint* itself. It does *not* prevent the Government from notifying the defendant that there is an investigation into the underlying events – in this case (or any other in which § 13710(a)(3)(B) is implicated), the defendant motor carrier's shipping charges at issue.

Thus, the 180-day notice requirement of § 13710(a)(3)(B) does not expressly conflict with the FCA's statute of limitations and sealing provisions, and, accordingly, the Court is duty-bound to give both of them effect. *See, e.g., Morton*, 417 U.S. at 551. This Court's inquiry should end there.

It is worth noting, nonetheless, that application of the 180-day notice requirement does not undermine the purposes of the FCA's statute of limitations and sealing requirements. The United States has identified six purposes behind those requirements – (1) to "prevent defendants from having to answer a complaint without knowing whether the government will pursue litigation"; (2) to

24

"encourage[ ] a defendant to reach a speedy settlement in order to avoid unsealing the complaint"; (3) to prevent public disclosure and therein "protect a defendant's reputation"; (4) to "ensure[ ]that the government need not rush to file a complaint"; (5) to "ensure[ ] that the government has adequate time to undercover [sic] the fraud before its right to recover is extinguished"; and (6) to "ensure that premature disclosure does not 'tip a defendant off to a pending criminal investigation.'" (Gov't Br. 13-15.)  None of those purposes is frustrated by enforcing § 13710(a)(3)(B).

Regarding the first and second rationales, notifying a motor carrier that the United States contests its charges will not cause the defendant to answer an FCA complaint before knowing whether the Government will intervene, or to lose the incentive to settle before the complaint is unsealed because, as already discussed, providing notice under § 13710(a)(3)(B) does not require even a partial unsealing of an FCA complaint. [4]  Regarding the third rationale, providing a motor carrier with notice of a shipping dispute likewise does not involve public disclosure or injury to the carrier's reputation because providing notice under § 13710(a)(3)(B) only requires private communication – such as a letter or facsimile – between the shipper and carrier, *see NAFTC*, 1997 WL 189658, at *3; it is not tantamount to

_____

[4] And, in fact, because satisfaction of the notice requirement is a precondition to commencing a civil lawsuit, notice must be provided before the complaint is even filed.  *CFS*, 1996 WL 303722, at *3.

publicly filing a complaint, and, obviously, it would be against the carrier's interests to publicly announce its involvement in billing disputes. Regarding the fourth rationale, the 180-day notice requirement does not shorten the applicable statute of limitations; it is a completely separate and distinct legal requirement. *See NAFTC*, 1997 WL 189658, at *5; *CTS*, 1996 WL 303722, at *2. Regarding the fifth rationale, the notice requirement does not foreclose a right of action in a case of actual fraudulent concealment because, as relators note, the doctrine of equitable tolling may toll the notice period until the Government can uncover the fraud.[5]

Finally, regarding the sixth rationale, § 13710(a)(3)(B) grants the Government 180 days to investigate the shipping charges before being required to notify the carrier of the dispute – a period three times longer than the initial 60 day period provided under the FCA's sealing provision. *See* 31 U.S.C. § 3730(b)(2). While § 13710(a)(3)(B) does place a time limit on the Government's pre-disclosure investigation, so too does every statute of limitations or notice period. Granting the Government half a year to investigate a common carrier's charge policies before requiring disclosure of the dispute of those charges (but not even disclosure of the specific *fraud* element of the dispute) is not so unreasonable as to

---

[5] As discussed below, equitable tolling does not apply in the present case because there was no fraudulent concealment and because the United States received full disclosure of DHL's surcharge policies.

overcome the long-standing presumption that statutes must be read so as to give effect to both of them.

Accordingly, because § 13710(a)(3)(B) does not conflict with the FCA's statute of limitations and sealing requirements, the 180-day notice requirement applies in the context of civil FCA claims.

### 2. TO THE EXTENT THE STATUTES CONFLICT, THE SPECIFIC PROVISIONS OF § 13710(A)(3)(B) CONTROL.

If the Court finds, however, that § 13710(a)(3)(B) conflicts with the statute of limitations and sealing provisions of the FCA, the specific notice requirement of § 13710(a)(3)(B) nevertheless controls.

The resolution of conflict existing between two statutes is "governed by the well-established principle that, in most contexts, 'a precisely drawn, detailed statute pre-empts more general remedies." *Hinck v. U.S.*, 550 U.S. 501, 506 (2007).

In the present context, the FCA is the more general remedy. In fact, such a basic label grossly understates its breadth, for as the Supreme Court has remarked, the FCA is "all-embracing in scope, national in its purpose." *See Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 791 (2000). Indeed, the Court has repeatedly held that "the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *See id.* at 792 (quoting *U.S. v. Neifert-White Co.*, 390 U.S. 228, 232 (1968); *see also*

27

*Rainwater v. U.S.*, 356 U.S. 590, 592 (1958) ("It seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims.").

In contrast, as relators acknowledge, the notice requirement of § 13710(a)(3)(B) is contained within a "narrow interstate transportation statute." (Rltrs.' Br. 23.)  Relators are correct in this regard; Part B of Subtitle IV of Title 49 regulates the very limited field of carriers in interstate transportation, and § 13710(a)(3)(B) establishes a notice requirement applicable to the specific context of contesting a motor carrier's charges.  And, as the Government notes (Gov't Br. 26), Congress recognized the need for the predecessor statute to § 13710 to address specific concerns with resolving disputes over the applicability of carriers' rates – *the very issue at the heart of relators' FCA claims here.*  Thus, the extent of any limited conflict between § 13710(a)(3)(B) and the FCA's statute of limitations and sealing provisions, that conflict must be resolved in favor of the limited notice provision of § 13710(a)(3)(B).

### 3. AN AGENCY OF THE UNITED STATES IS A "SHIPPER" WITHIN THE SCOPE OF § 13710(A)(3)(B).

The Government also contends that an agency of the United States is not a "shipper" for purposes of § 13710(a)(3)(B) and thus is not subject to the 180-day notice provision.  But this argument finds no support either in the text of Subtitle IV or in common sense.

28

As the Government notes (Gov't Br. 22), the term "shipper" is not defined within Part B of Subtitle IV of Title 49.  *See* 49 U.S.C. § 13102.  Under traditional canons of statutory interpretation, an undefined term is given its typical meaning.  *Tanguchi*, ___ U.S. ___, 132 S. Ct. at 2002.  There is nothing about the word "shipper" that would suggest it is limited to natural persons and excludes governmental entities or the United States.

Congress defined "individual shipper" in Part B and used this phrase separately and on its own, apart from "shipper."  *Compare* 49 U.S.C. §§ 13702(c)(3), 14104, 14710(a), 14711(a), 14901(d)(1) ("individual shipper") *with, e.g.,* 49 U.S.C. § 13710(a)(3)(B) ("shipper").  The United States argues that because the definition of the term "individual shipper" includes the word "person," "individual shipper" does not include the United States.  (Gov't Br. 22.)  It may be that the United States is not an "individual shipper" as that phrase is used in § 13102(13), but the statute at issue – § 13710(a)(3)(B) – does not use that phrase; it uses "shipper" instead.

There is no reason to conclude that Congress used or intended the use of "individual shipper" interchangeably with "shipper."  To the contrary, "the use of different words within the same statutory context strongly suggests that different meanings were intended."  *United States v. Mason*, 692 F.3d 178, 182 (2d Cir. 2012).  "Congress's explicit decision to use one word over another . . . is imbued

29

with legal significance and should not be presumed to be random or devoid of meaning." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). And "[e]ven words with remarkably similar definitions can still convey a unique or distinct meaning or flavor." *Id.*

That is the case here. "Individual shipper" is more narrow than "shipper." If the Government is correct that the term "individual shipper" within Part B is limited to natural persons and non-governmental entities, the ordinary meaning of the word "individual" (*i.e.* natural person) explains why both terms are used – to distinguish between non-governmental shippers and all shippers (including government agencies). *Cf. Mohamad v. Palestinian Auth.*, ___ U.S. ___, 132 S. Ct. 1702, 1707-08 (2012) (addressing the significance of the term "individual" in the Torture Victim Protection Act).

Furthermore, the specific instances in which the distinct term "individual shipper" is used in Part B confirm this reading. While the term "shipper" is used dozens of times, the term "individual shipper" appears in only five sections aside from its initial definition, and in each of those sections, it is used in the context of consumer protection. *See* 49 U.S.C. §§ 13702(c)(3), 14104, 14710(a), 14711(a), 14901(d)(1). Naturally, a governmental agency is not typically covered by consumer protection provisions; thus, the use of the term "individual shipper" in that – and only that – context confirms that Congress intended the term "individual

30

shipper" to include natural persons and the term "shipper" to more broadly include all who ship, including governmental agencies.

This reading of the two distinct statutory terms is also supported by simple common sense. When governmental agencies are acting as "shippers" for purposes of Part B, they are performing a solely proprietary function, rather than a governmental function. In this context, there is no reason to differentiate between a government agency and any other shipper. Indeed, the effect of excluding governmental agencies from the definition of "shipper" would be to deprive the United States of protections and rights set forth in Part B, including the ability to contest the applicability and reasonability of a motor carrier's rates before the STB. *See* 49 U.S.C. § 13710(a)(3)(B). There is no basis to conclude that Congress intended that result, just as there is no basis to conclude that Congress's use of both "individual shipper" and "shipper" was accidental or intended to convey identical meanings.

### 4. A CLAIM ASSERTED UNDER THE FCA IS A "CONTEST" WITHIN THE SCOPE OF § 13710(A)(3)(B).

The Government also suggests that an FCA claim does not constitute a "contest" for purposes of § 13710(a)(3)(B). But this argument, too, lacks any support in the statutory text or common usage.

Because "contest" is not defined within Part B, we look to its typical use. *See Tanguchi*, ___ U.S. ___, 132 S. Ct. at 2002. The transitive verb "contest" is

31

broadly defined as: "to make the subject of dispute, contention, or litigation." *See* Merriam-Webster. And when, as here, a motor carrier's allegedly improper charges give rise to litigation, those charges are obviously the subject of the litigation, regardless of nature of the claim; whether in the context of a breach of contract claim or, as here, an FCA claim, the charges are necessarily the subject of the litigation, therein bringing the claim within the scope of § 13710(a)(3)(B).

Furthermore, as the STB has noted, the 180-day notice requirement of § 13710(a)(3)(B) is, by its own terms, a "broadly worded requirement." *CTS*, 1996 WL 303722, at *3. Indeed, the "plain language of section 13710(a)(3)(B) conditions a shipper's right to challenge a bill on its contesting it within the prescribed time period, *without limitation as the nature of the claim*." *NAFTC*, 1997 WL 189658, at *4 (emphasis added).

The Government counters that § 13710(a)(3)(B) was enacted in response to specific concerns regarding disputes over the applicability of motor carriers' rates and that nothing "suggests that Congress intended Section 13710 to apply beyond that context." (Gov't Br. 26.) But what the Government fails to recognize is that the applicability of a motor carrier's rates *is* the very issue before the Court. Relators allege that DHL applied improper fuel surcharges to shipments. At issue is whether DHL's contract documents – its waybills, rate guide, and fuel surcharge tables – allowed DHL to apply those fuel surcharges to certain government

32

shipments.  There is absolutely nothing in the statutory text or the interpreting STB opinions that suggests that these billing disputes are removed from the scope of § 13710(a)(3)(B) simply because they are raised in the context of an FCA claim, rather than as a breach of contract claim.

### C.     THE 180-DAY NOTICE PERIOD IS NOT TOLLED UNDER THE WARTIME SUSPENSION OF LIMITATIONS ACT.

Relators contend that even if the 180-day notice requirement is applicable, it is tolled under the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287.  But their reliance on WSLA is misplaced for several reasons.

First, as relators acknowledge, they failed to assert the WSLA's applicability before the district court.  (Rltrs.' Br. 32 n.6.)  "For good reason, appellate courts ordinarily abstain from entertaining issues that have not been raised and preserved in the court of first instance."  *Wood v. Milyard*, ___ U.S. ___, 132 S. Ct. 1826, 1835 (2012); *see also Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1077 (2d Cir. 1993) (A "party opposing summary disposition of a case must raise all arguments against such remedy in the trial court and may not raise them for the first time on appeal.").

Second, by its express terms, the WSLA tolls statutes of limitations, not pre-suit notification requirements.  Thus, the toll is inapplicable to the 180-day notice precondition.

33

Third, even if the WSLA applies to certain civil FCA actions, it does not

apply were, as here, the Government has declined to intervene and the relator is

proceeding alone. *U.S. ex rel. Carter v. Halliburton Co.*, No. 1:11-cv-602, 2011

WL 6178878, at *12 (E.D. Va., Dec. 12, 2011). Under plain language of the

WSLA, tolling extends only to the United States, not to relators. *Id.* at *11; *cf.*

*U.S. ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 293 (4th Cir. 2008)

(Extension of the FCA's statute of limitations under 31 U.S.C. § 3731(b)(2) applies

only to FCA cases in which the United States has elected to intervene.). And,

furthermore, public policy counsels against extension of WSLA to FCA actions

brought solely by relators because allowing relators the toll would give them a

"strong financial incentive to allow false claims to build up over time before they

filed, thereby increasing their own potential recovery." *U.S. ex rel. Carter*, 2011

WL 6178878, at *11 (quoting *U.S. ex rel. Sanders*, 546 F.3d at 294).

Fourth, because the latest disputed shipping charge at issue occurred in

March 2008 (J.A. 36) and the 180-day notice period thus expired prior to October

14, 2008, an older version of the WSLA applies here. *See U.S. v. Latimer*, No. cr-

11-384, 2012 WL 1023569, at *3 (W.D. Okla., Mar. 27, 2012); *U.S. v. Anghaie*,

No. 1:09-cr-37, 2011 WL 72004, at *2 (N.D. Fla., Feb. 21, 2011). Under that

version, a toll applied only when the United States was "at war." *See U.S. v.*

*Western Titanium, Inc.*, No. 08-cr-4229, 2010 WL 2650224, at *2 (S.D. Cal. July

34

1, 2010).  Because Congress did not formally declare war in connection with the conflicts in Iraq and Afghanistan, the toll could not have applied.  *See id.*, at *3; *Anghaie*, 2011 WL 72004, at *2; *see also U.S. v. Shelton*, 816 F. Supp. 1132, 1135 (W.D. Tex. 1993).  *But see U.S. v. Pfluger*, 685 F.3d 481, 483 n.3 (5th Cir. 2012) (treating conflicts in Afghanistan and Iraq as being "at war" after defendant conceded the point).  Congress amended the WSLA on October 14, 2008, to add a clause invoking the toll when "Congress has enacted a specific authorization for the use of Armed Forces" – a clear indication that a congressional authorization of force would not implicate the toll under the version of the statute in effect before that date.  *See Western Titanium*, 2010 WL 2650224, at *4.

For any and all of those reasons, the WSLA did not toll the 180-day notice requirement in the present case.

### D.   THE 180-DAY NOTICE PERIOD IS NOT SUBJECT TO EQUITABLE TOLLING.

Relators similarly assert that their claims are saved by equitable tolling, but that argument is equally unconvincing.

First, providing notice is "a *precondition* for pursuing a claim," not a statute of limitations that can be equitably tolled.  *CTS*, 1996 WL 303722, at *3 (emphasis added).  Neither the Government nor relators provided DHL with the requisite statutory notice, and an equitable toll cannot remedy that flaw.

35

Moreover, federal courts have traditionally applied the doctrine of equitable tolling "sparingly." *Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89, 96 (1990). As this Court has repeatedly held, equitable tolling is "only appropriate in '*rare and exceptional circumstance[s]*,' such as when a party 'is prevented in some *extraordinary* way from exercising his rights.'" *See Cherry v. City of New York*, 381 Fed. Appx. 57, 59 (2d Cir. 2010) (emphasis added) (alteration in original) (quoting *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003)). No one and nothing prevent the Government from contesting the fuel surcharges when they were incurred, and DHL notified its customers that the charges were being assessed at the time the customers shipped their packages.

In *Pearl v. City of Long Beach*, 296 F.3d 76 (2d Cir. 2002), this Court acknowledged that *active* fraudulent concealment of a false claim might prevent a plaintiff from bringing suit and therefore justify equitable relief. *Id.* at 88. But relators have not suggested any active concealment here, and the undisputed record establishes that customers were made aware of the fuel surcharges. Indeed, plaintiffs do not contend that defendants *hid* the imposition of fuel surcharges; rather, plaintiffs allege only that defendants improperly imposed them. Under such circumstances, the United States failed to act "with reasonable diligence" and is not entitled to an equitable toll. *See Cherry*, 381 Fed. Appx. at 59; *Zerilli-Edelglass*, 333 F.3d at 80; *see also NAFTC*, 1997 WL 189658, at *6 ("It is

36

unfortunate that some shippers, under their current auditing practices, are sometimes unable to detect problems until after the 180-day period for contesting claims has passed, but Congress decided to impose the 180-day notification period nonetheless.").

Equitable tolling is available only to the extent that a plaintiff "acted with reasonable diligence throughout the period he seeks to toll." *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007). In other words, the doctrine does not toll time indefinitely; rather, it tolls only the period when the rare, exceptional, and extraordinary circumstances continue to exist. *See Harper v. Ercole*, 648 F.3d 132, 139-40 (2d Cir. 2011). Here, even if there were circumstances permitting equitable tolling, those circumstances necessarily ended once relators gave the Government notice of defendants' shipping practices at issue. That occurred no later than April 18, 2008, when plaintiffs filed their original complaint. Yet the Government did not contest any charges within the following 180 days – and, in fact, it still has not. Under these circumstances, the doctrine of equitable tolling cannot save relators' claims.

### E. JIM BALL'S LETTER TO DEFENDANTS DOES NOT SATISFY § 13710(A)(3)(B).

The Government formally recognizes DHL as a motor carrier for purposes of § 13710(a)(3)(B). (J.A. 47-48.) As a result, the Government was required to notify DHL of any dispute regarding the charges at issue within 180 days of receipt

37

of DHL's bills. But neither the Government nor relators have even attempted to provide the requisite notice.

In a last-ditch effort to avoid dismissal, relators contend that a letter (J. A. 194) written by their attorneys on October 10, 2008, and submitted on behalf of Jim Ball Pontiac-Buick-GMC, Inc., a stranger to this litigation, satisfies § 13710(a)(3)(B). But that argument fails for several reasons.

First, and most basically, "providing notice to the other party within the statute's 180-day period is a *precondition* for pursuing a claim." *CTS*, 1996 WL 303722, at *3 (emphasis added). Thus, notice must be given *before* commencement of a civil action. Here, plaintiffs' counsel submitted its letter nearly six months *after* this action was commenced on April 18, 2008. (J.A. 7, 193.) As such, the letter is legally insufficient.

Second, the proposition that third parties may contest charges on behalf of the United States so as to satisfy § 13710(a)(3)(B) lacks any support in the law. Plaintiffs rely on *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332 (11th Cir. 1984), and *Freeman v. Celebrity Cruises, Inc.*, Nos. 94-cv-5270, 94-cv-5473, 94-cv-5546, 1994 WL 689809 (S.D.N.Y. Dec. 8, 1994), but those cases were fundamentally different from this one in that they were putative class actions. If a putative class representative is deemed able to provide a notice of claim on behalf of other putative class members – a proposition DHL disputes – that determination

38

is not completely inconsistent with the nature of class actions, in which the putative representative will ultimately act on behalf of the class if a class is certified. But class actions are unique in that regard. There is absolutely no precedent that would allow a party to a non-class action to rely on the actions of a stranger to the litigation to satisfy a notice requirement.

The fact that the FCA, 31 U.S.C. § 3730(b), allows third parties to bring a *qui tam* action on behalf of the United States does not mean that the notice requirement of a separate statute can be satisfied by having a lawyer for some other shipper dispute some other shipping invoices. The letter on which relators rely was submitted on behalf of a non-party disputing different shipments than the ones at issue in this litigation. (*See* J.A. 194.)

Finally, even if plaintiffs could somehow rely on a different shipper having given notice disputing different shipments, the letter in question still is inadequate. That letter offers a blanket objection to all Next Day and 2nd Day deliveries carried by ground transportation on which a jet fuel surcharge was imposed; it makes no reference to individual shipments. (*Id.*) The plain language of § 13710(a)(3)(B) demands more than a general objection to a shipping practice; it requires specifically contesting individual bills. *Cf. CTS*, 1996 WL 303722, at *3 ("[A] shipper loses any right to contest charges . . . if it does not notify the carrier of its disagreement within 180 days of receiving the disputed bill."). Likewise, the

letter was submitted explicitly by "Jim Ball Pontiac-Buick-GMC, Inc., on behalf of itself and all other *similarly-situated* United States customers of DHL." (J.A. 194 (emphasis added).) This did not give sufficient notice of the government shipments relators intended to challenge, especially because the letter was immediately followed by Jim Ball's commencement of a class action that explicitly *excluded* the federal government from the putative class. (J.A. 203.)

Allowing the letter to satisfy the notice requirement under § 13710(a)(3)(B) would frustrate Congress's intent to provide carriers with the opportunity to timely investigate and defend against allegations of improper charges. By disregarding the statute, relators have prejudiced DHL's ability to reconstruct the shipping evidence for thousands of disputed shipments. For that reason, the district court properly dismissed the amended complaint, and this Court should affirm that decision.

## II. RELATORS HAVE FAILED TO PLAUSIBLY ALLEGE THAT DHL KNOWINGLY SUBMITTED FALSE CLAIMS.

The issue of notice aside, each of the other defenses DHL raised in its motion to dismiss also requires dismissal.[6]

---

[6] Because the district court dismissed the amended complaint for failure to satisfy § 13710(a)(3)(B), the court declined to consider DHL's other arguments, namely (1) failure to plausibly allege the knowing submission of false claims; (2) failure to plead fraud with adequate particularity; and (3) violation of the statute of limitations. (J.A. 262.) Those defenses are properly considered on appeal. *See,*

40

Most fundamentally, relators have failed to plausibly allege that DHL knowingly submitted a single false claim to the Government. The gravamen of the amended complaint is that DHL used false statements to induce the United States into paying fuel surcharges. (J.A. 29.) But DHL's waybills (J.A. 96-97, 105-06), fuel surcharge tables (J.A. 102-03), and rate guide (J.A. 59) (collectively, the "contract documents") disclosed that DHL might move "Air Express" packages by road, and that jet fuel surcharges apply regardless of the manner or mode of transportation. These documents conclusively refute relators' allegations of fraud and entitle DHL to dismissal because DHL did not make a false claim.

Relators' claims fail as a matter of law and must be dismissed for either of two alternative reasons: First, the only plausible interpretation of the documents that govern DHL's rates is that DHL may impose jet fuel surcharges on all Next Day and 2nd Day shipments, regardless of the method of transportation, and diesel fuel surcharges on all Ground Delivery shipments. Thus, the fuel surcharges cannot possibly constitute false claims. Second, even if this Court concludes that the fuel surcharge provisions are ambiguous, DHL has a reasonable interpretation of those provisions, and under the well-settled precedent of several circuits, an FCA claim does not lie if a defendant relied upon a reasonable interpretation of contractual provisions.

_e.g._, _Powell v. Schriver_, 175 F.3d 107, 113 (2d Cir. 1999); _Burgo v. Gen. Dynamics Corp._, 122 F.3d 140, 145 (2d Dep't 1997).

41

A.   **DHL'S CONTRACT DOCUMENTS CLEARLY PROVIDE FOR THE IMPOSITION OF THE FUEL SURCHARGES AT ISSUE.**

A complaint can survive a motion to dismiss under Rule 12(b)(6) only if it states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In addition to considering the allegations on the face of the complaint, the court may also rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Likewise, even "[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). When the factual allegations of the complaint are contradicted by such documents, the court need not accept the allegations as true. *See Feick v. Fleener*, 653 F.2d 69, 75 (2d Cir. 1981) ("Since the documents upon which appellants based their claim show on their face absence of any grounds for relief, dismissal was proper.").

The most fundamental element of a cause of action under the FCA is, of course, a knowingly false claim. *See* 31 U.S.C. § 3729(a)(1)(A)-(C). Here, the amended complaint alleges that DHL's false claims consisted of three misrepresentations: "(a) that shipment [of Next Day and 2nd Day packages] was

42

by air, (b) that jet fuel surcharges were properly incurred [on Next Day and 2nd Day packages], and (c) that, in certain instances, diesel fuel surcharges were needed to compensate DHL [for Ground Delivery Service packages]." (J.A. 38-39.) As their brief reflects (Rltrs.' Br. 15-16, 41-44), relators reach these conclusions by relying heavily upon – but misconstruing – DHL's contract documents, including its waybills, fuel surcharge tables, and rate guide. There is no doubt that those documents are integral to the complaint. Consequently, they may be considered at this juncture. *See, e.g., DiFolco*, 622 F.3d at 111.[7]

Relators' allegation that DHL "misrepresented that Next Day and 2nd Day packages would travel by air" (J.A. 35) is most obviously contradicted by the contract documents. The waybill applicable to Next Day and 2nd Day packages contradicts this conclusory assertion and explicitly discloses that shipments "may be carried by any means DHL chooses, including air, road or any other carrier." (J.A. 106.) That disclosure, which unequivocally and unambiguously discloses that Next Day and 2nd Day packages may travel by any means of transportation, including road, could not possibly mislead a government shipper into thinking all shipments would travel by air. Relators ignore this provision altogether.

---

[7] Relators have not contested DHL's proffer of its contract documents, and the Court's consideration of these documents will not prejudice relators because they had actual notice of these documents long before DHL served its motion to dismiss. The same contract documents have been at the center of the similar state court *qui tam* actions relators have pursued against DHL (J.A. 182-84), as relators acknowledge (Rltrs.' Br. 47).

Second, relators' allegation that DHL misrepresented that "diesel fuel surcharges were needed to compensate DHL" (J.A. 38-39) when, "in fact, only a small portion of those surcharge amounts was passed along to DHL's independent contractor network of trucking companies who bought the relevant fuel" (J.A. 30) also is squarely refuted by the contract documents. Specifically, DHL's rate guide explicitly states that "Ground shipments are assessed a fuel surcharge which is indexed to the U.S. Dept. of Energy's on-highway diesel fuel index." (J.A. 90.) Thus, the imposition of a diesel fuel surcharge on all shipments carried by DHL's Ground Delivery Service was clearly disclosed. It is completely irrelevant that a portion of the surcharge was not passed on to the subcontractors who bought their own fuel (J.A. 38-39) because DHL never suggested to the Government that it would pass the entire surcharge on to its subcontractors.

Third, relators' allegation that DHL "misrepresented that certain Next Day and 2nd Day shipments were delivered by air such that jet fuel surcharges were necessary, when, in fact, they were delivered solely by ground transportation" (J.A. 30) is also flatly contradicted by the contract documents. DHL's rate guide (J.A. 90) and fuel surcharge tables (J.A. 102) clearly reflect that a jet fuel surcharge is assessed on *all* Air Express Services shipments. Noting that the term "Air Express Services" is not explicitly identified as a class of services in DHL's rate guide, relators interpret the term literally and contend that "Air Express Services" refers

44

to shipments that are transported by air. (Rltrs.' Br. 41.) In other words, relators argue that Air Express Services are not a class of services, but rather a method of transportation. (Rltrs.' Br. 16.) Thus, they conclude, a jet fuel surcharge could only be applied to those shipments that *actually* were transported by air. (*Id.*)

The problem with relators' interpretation of the meaning of "Air Express Services" is that it is contrary to the express disclosures contained within the contract documents, and takes the phrase completely out of the specific context of the DHL contract documents in which it appears. The particular words of a contract are not to be considered in isolation, but rather in the context of the contract as a whole. *E.g., JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). When viewed in isolation, "Air Express Services" might naturally be interpreted as referring generally to transportation by air, but when considered in light of DHL's contract documents, the only plausible reading is that "Air Express Services" refers to a class of DHL services that includes Next Day and 2nd Day services.[8]

_____

[8] The single sentence relators quote from this Court's decision in *REA Express, Inc. v. Civil Aeronautics Board*, 507 F.2d 42 (2d Cir. 1974), is taken out of context and has no bearing on the Court's inquiry here. In *REA Express*, the Court considered whether the petitioning air carrier could preclude competitors from using the term "Air Express," which was its service mark. *Id.* at 44. In stating that the term "Air Express" meant "simply the speedy delivery of goods by air and not any company's particularized kind of service," this Court was merely rejecting the petitioner's claim that its competitors were unfairly using the term "Air Express" when the petitioner's "Air Express" service had "several unique

45

DHL's rate guide (J.A. 90) and fuel surcharge tables (J.A. 102-03) specify that the type of fuel surcharge (diesel or jet) depends upon the class of service, not the method of transportation. "DHL Air Express Services" are assessed a jet fuel surcharge, and "DHL Ground Delivery Service" is assessed a diesel fuel surcharge. (J.A. 102.) Even though "Air Express Services" is not explicitly defined in DHL's rate guide, "Ground Delivery Service" is. "DHL Ground" is listed as one of DHL's services in its rate guide and described as "*Door-to-door delivery throughout the U.S. (48 contiguous states) in 1-6 business days.*"[9] (J.A. 59 (emphasis in original).) Notwithstanding the fact that this service is entitled *Ground* Delivery Service, the accompanying description does not suggest that packages shipped by this service are always transported by ground. (*See id.*) And the waybill applicable to the "Ground Delivery Service" unequivocally states that packages delivered by that class of service "may be carried by any means DHL chooses, including air, road or any other carrier." (J.A. 96.) No one is misled. The documents reveal that DHL's Ground Delivery Service is a *class* of delivery

_____

features of direct benefit to shippers." *Id.* at 44-45. The Court did not consider the present question – whether a company can use the term "Air Express Services" to refer to one of its classes of services, rather than a method of actual transportation – and, thus, the *REA Express* decision is inapposite.

[9] DHL uses the terms "DHL Ground Delivery Service," "Ground Delivery Service," "DHL Ground," and "Ground" interchangeably throughout its contract documents, but those terms clearly all refer to the same class of service. Likewise, DHL uses the terms "DHL Air Express Services," "Air Express Services," and "Air Express" interchangeably, but, again, those terms clearly all refer to the same class of services.

service and not a method of transportation. DHL's denomination of its slower

delivery service as "Ground Delivery Service" is figurative and merely designed to

conjure a more effective title than "Not-So-Express Delivery Service."

Similarly, the type of fuel surcharge (either diesel or jet) assessed on a

shipment depends upon whether the shipment falls under the category "DHL

Ground Delivery Service" or "DHL Air Express Services." (J.A. 102.) Just as the

contract documents disclose that the term "DHL Ground Delivery Service" is a

*class* of delivery service and not a method of transportation, the term "DHL Air

Express Services" refers to a *class* of delivery services and not a method of

transportation. Any other reading would unnecessarily create conflicting

contractual terms. For instance, if, as relators argue, "Air Express Services"

should literally mean transportation by air, then a DHL customer would not know

what surcharge would apply to a shipment sent by the DHL Ground Delivery

Service but actually transported by air. Relators' insistence that "Air Express

Services" has to mean literal shipment by air would leave customers guessing

which surcharge applies – or whether both do. *That* might be misleading or

deceptive, and it would conflict with the clear terms applicable to "DHL Ground

Delivery Service." To avoid this confusion and absurdity and to prevent

unnecessarily conflicting contract terms, the least misleading option and the most

logical conclusion is that the term "Air Express Services" also refers to a *class* of

47

DHL's delivery services, rather than a method of transportation.[10] *See, e.g., Galli v. Metz*, 973 F.2d 145, 149 (1992) (A contract interpretation that "gives reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." (quoting *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985)).

This interpretation is confirmed by a review of the rate guide's description of DHL's services. DHL's main Domestic Services are listed and described on a single page of the rate guide (as well as in the table of contents) in order of expediency – (1) DHL SAME DAY, (2) DHL NEXT DAY 10:30 AM, (3) DHL NEXT DAY 12:00 PM, (4) DHL NEXT DAY 3:00 PM, (5) DHL 2ND DAY, and (6) DHL GROUND. Although the term "Air Express Services" is not explicitly defined in the rate guide, it is directly referenced in the description of Ground Delivery Services:

___

[10] Relators object that DHL's rate guide (J.A. 90) states that "Air Express shipments" – rather than "Air Express Services shipments" – are charged a jet fuel surcharge and "Ground shipments" – rather than "Ground Delivery Service shipments" – are charged a diesel fuel surcharge. (Rltrs.' Br. 16.) But this argument lacks merit. As previously noted, DHL uses the terms "DHL Ground Delivery Service," "Ground Delivery Service," "DHL Ground," and "Ground" interchangeably to refer to the same class of services, and the same is true of its use of the terms "DHL Air Express Services," "Air Express Services," and "Air Express." Indeed, these terms are used interchangeably even within the fuel surcharge tables and the brief accompanying explanations. (J.A. 102-03.) Regardless, the fuel surcharge tables themselves clearly indicate that the *diesel* fuel surcharge applied to "DHL Ground Delivery Service" and the *jet* fuel surcharge to "DHL Air Express Services." There is nothing misleading about that.

48

**DHL GROUND**

*Door-to-door delivery throughout the U.S. (48 contiguous states) in 1-6 business days.*

DHL GROUND offers increased savings without decreased service features. We guarantee your packages receive the same attention and careful handling that you value with our Air Express services, including tracking and delivery details.

(J.A. 59 (emphasis in original).) This reference to DHL's "Air Express Services" informs the customer about the contrast between the two classes of service. When DHL Ground – DHL's less expedient shipping service – is listed and described immediately after DHL's more expedient shipping services – namely, DHL Same Day, DHL Next Day, and DHL 2nd Day – DHL's comparison of DHL Ground to DHL's Air Express Services clearly indicates that the term "Air Express Services" refers to those more expedient services – *i.e.* Same Day, Next Day, and 2nd Day. But at the same time, the waybill clearly states that DHL might ship Air Express – *i.e.* Next Day and 2nd Day – shipments by ground at its discretion. (J.A. 106.) Read together, DHL's rate guide (J.A. 59, 90), fuel surcharge tables (J.A. 102-03), and waybill (J.A. 106) inform customers that parcels shipped by DHL's "Air Express Services" are assessed a jet fuel surcharge but may travel by ground.[11]

---

[11] Shipments sent by DHL Same Day are specifically exempted from this surcharge. (J.A. 90, 102.)

49

Nor is there anything improper with that surcharge structure, as relators acknowledge (J.A. 44). Of course, the FCA does not prohibit DHL from choosing which orders to surcharge and how to spread its fuel costs among its customers, as long as it does not knowingly make a false statement to its government customers. DHL could, for example, assess a higher jet fuel surcharge on only those shipments that were actually transported by air. Or DHL could spread a lower jet fuel surcharge among all shipments, regardless of service class or actual method of delivery. Or DHL could adopt the policy that it actually did adopt, assessing all Next Day and 2nd Day shipments a jet fuel surcharge and all Ground Delivery Service shipments a diesel fuel surcharge, regardless of how those shipments were actually carried. As long as the carrier discloses what it is charging and the how it is transporting its shipments – as DHL unquestionably did here – there is nothing fraudulent about imposing those charges. And, indeed, DHL's policy is likely the most cost-effective, efficient, straightforward, and honest of the various alternatives. Any of the other alternatives would leave customers guessing which surcharge might be added to the cost of shipment.

### B. DHL'S INTERPRETATION OF THE GOVERNING CONTRACTUAL DOCUMENTS IS PLAUSIBLE AND OBJECTIVELY REASONABLE AND, THUS, AS A MATTER OF LAW, CANNOT SUPPORT AN FCA CLAIM.

The only logical reading of DHL's waybills, rate guide, and fuel surcharge tables directly contradicts relators' assertions that DHL made false claims to the

50

Government. After all, the documents told the customers "Air Express" shipments might travel by ground, "Ground" by air, and that the jet and diesel fuel surcharges applied depending upon the *class* of shipment and regardless of manner or mode of actual transportation. Even if this Court concludes that these contract documents are somehow ambiguous, relators still cannot establish the existence of a false claim because DHL's interpretation of the contract terms is objectively reasonable.

It is now widely accepted that an FCA relator cannot "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act." *See U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373 (4th Cir. 2008). Nor can the relator "base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision." *Id.* at 378. This makes good sense; it should not be said a claim was "false" if there was an objectively reasonable basis for making it.

Every circuit court to consider the issue has concluded that a cause of action does not lie under the FCA when the allegedly false claim is premised on the defendant's reasonable interpretation of an ambiguous or imprecise contract or statute. *See, e.g., U.S. ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 957 (8th Cir. 2012); *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011); *U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010); *U.S. ex rel. Owens v. First Kuwati Gen. Trading*

51

*& Contracting Co.*, 612 F.3d 724, 734 (4th Cir. 2010); *U.S. ex rel. Wilson*, 525

F.3d at 378; *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,

530 F.3d 980, 983 (D.C. Cir. 2008); *U.S. ex rel. Farmer v. City of Houston*, 523

F.3d 333, 340 n.12 (5th Cir. 2008); *U.S. v. Southland Mgmt. Corp.*, 326 F.3d 669,

682 (5th Cir. 2003) (Jones, J., specially concurring); *U.S. ex rel. Swafford v.

Borgess Med. Ctr.*, 24 F. App'x 491, 491 (6th Cir. 2001); *U.S. v. Basin Elec.

Power Coop.*, 248 F.3d 781, 792 (8th Cir. 2001); *U.S. ex rel. Lamers v. City of

Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999); *Hagood v. Sonoma County Water

Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996); *U.S. ex rel. Butler v. Hughes

Helicopter, Inc.*, 71 F.3d 321, 329 (9th Cir. 1995).

The present case is no different. This clearly is a contract dispute that

relators have attempted to convert into an FCA claim, and that should not stand.

To borrow the Fourth Circuit's words:

> Since initiating this litigation, Relators have consistently
> sought to shoehorn what is, in essence, a breach of
> contract action into a claim that is cognizable under the
> False Claims Act. This misguided journey must come to
> an end. If every dispute involving contractual
> performance were to be transformed into a *qui tam* FCA
> suit, the prospect of litigation in government contracting
> would literally have no end.

*See U.S. ex rel. Wilson*, 525 F.3d at 373. DHL maintains that its reading of the

governing contract documents is the only plausible interpretation. But this Court

need not reach that issue in this case because DHL's interpretation is plausible and

52

objectively reasonable. That, in and of itself, dooms relators' FCA claims as a matter of law and entitles DHL to dismissal of the amended complaint. *See, e.g., U.S. ex rel. Wilson*, 525 F.3d at 378.

That rule is consistent with – and, in fact, derived from – two of the most fundamental principles of the FCA. First, a "statement may be deemed 'false' for purposes of the False Claims Act only if the statement represents 'an *objective* falsehood.'" *U.S. ex rel. Yannacopoulos*, 652 F.3d at 836 (emphasis added) (quoting *U.S. ex rel. Wilson*, 525 F.3d at 376); *accord U.S. ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 412 (4th Cir. 2010); *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 959 (10th Cir. 2008); *U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 982 (10th Cir. 2005). Second, under the express terms of the FCA, a relator must demonstrate significant *scienter* – either that the defendant had actual knowledge of the falsity of the claim or that he acted in deliberate ignorance or reckless disregard of the truth. *See* 31 U.S.C. § 3729(b)(1)(A).

The determinative principle – that an FCA claim cannot be premised on a reasonable interpretation of an imprecise contractual provision – is fair and logical, as is its result here. As the Fourth Circuit has recognized, "[w]hile the 'phrase 'false or fraudulent claim' in the False Claims Act should be construed broadly,' it just as surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood." *Id.* at 377 (quoting *Harrison v.*

53

*Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)) (internal citation omitted).  Indeed, to allow a relator to "base a fraud claim on nothing more than his own interpretation of an imprecise contract . . . would render meaningless the fundamental distinction between actions for fraud and breach of contract."  *Id.*; *see also U.S. v. Science Apps. Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010) ("Strict enforcement of the FCA's scienter requirement will also help to ensure that ordinary breaches of contract are not converted into FCA liability.").

Allowing FCA liability to creep into the realm of routine contract disputes "threatens to penalize good faith disagreements over matters of commercial judgment."  *See U.S. ex rel. Owens*, 612 F.3d at 734.  And even beyond the sheer inequity of seeking to impose treble and other statutory damages based on a run-of-the-mill contract dispute, it would also drive up the cost of government contracting and "discourage many perfectly honest companies from wanting to do business with the United States."  *See id.*  Such negative consequences are particularly undesirable where, as here, the Government has not elected to intervene – or, for that matter, even pursued a breach-of-contract claim against DHL – and "the party invoking [the FCA] is an uninjured third-party."  *See id.*

The Supreme Court has embraced the same principle at issue here under like circumstances.  In *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007), the Court considered a class action stemming from alleged violations of the

Fair Credit Reporting Act's notice obligation under 15 U.S.C. § 1681m(a). *Id.* at 52. The Court ruled that the plaintiffs had failed to establish the requisite reckless disregard of the notice provision because the provision's terms were unclear and the defendant's interpretation was objectively reasonable. *Id.* at 69. As the Court articulated, a reasonable interpretation of an unclear provision, as a matter of law, cannot give rise to a knowing or reckless violation:

> Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator.

*Id.* at 70 n.20.

That same principle is determinative here. Because DHL has an objectively reasonable interpretation of the governing contract documents, relators' FCA claim premised on a different interpretation of those documents fails as a matter of law.

## III. RELATORS HAVE FAILED TO PLEAD THEIR CLAIMS WITH PARTICULARITY.

The amended complaint also must be dismissed for want of the particularity required by FRCP 9(b).

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Because FCA claims necessarily involve fraud, they must be pled with this particularity. *Gold v. Morrison-Kudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995).

55

To satisfy Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009). And as this Court has acknowledged, strict adherence to Rule 9(b)'s heightened pleading standard is necessary to safeguard important policies: "The purpose of Rule 9(b) is threefold – it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Id.*

Here, relators' amended complaint falls woefully short of Rule 9(b)'s requirements and threatens all three rationales. Relators allege the conclusory assertion that DHL engaged in three fraudulent practices by misrepresenting "(a) that shipment was by air, (b) that jet fuel surcharges were properly incurred, and (c) that, in certain circumstances, diesel fuel surcharges were need to compensate DHL." (J.A. 38-39.) But their complaint lacks factual specificity sufficient to afford DHL fair notice.

Relators fail to particularize when and how long DHL implemented the alleged practices; relators vaguely declare that they began "in 2003 *or* 2004" and "continued through *at least* 2008." (J.A. 34-35 (emphasis added).) The amended

complaint intimates that not every shipment during this nebulous period – indeed, not even every shipment included in the three categories identified by relators – was actually the subject of a supposedly false claim, but it provides no basis for distinguishing among them.  Apparently, some of the shipments were pursuant to government contracts to which the surcharge policies at issue did not apply.  (J.A. 37.)  And some of the shipments were not actually DHL shipments; they were the shipments of a predecessor company.  (J.A. 39.)

Most egregiously, relators provide only three "examples" of the alleged false claims, all from February and March 2008.  (J.A. 36.)  But a mere three examples from a two-month period does almost nothing to particularize the allegations that the fraudulent scheme spanned six years and involved "many hundreds of thousands of packages" (J.A. 35).  *See U.S. ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493, 510-11 (6th Cir. 2007).

The "submission of a false claim to the government is the cornerstone of any fraud claim pursuant to the FCA."  *Johnson v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 266 (W.D.N.Y. 2010).  "Rule 9(b), as applied to the FCA, requires a relator to provide specific details identifying particular claims submitted to the government."  *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 85 (D. Conn. 2006).  Here, relators have only pointed to three shipments, and they cannot even say for certain that the allegedly improper surcharges were actually assessed to

57

those three shipments. Instead, they merely allege it "upon information and belief." (J.A. 36.) Allegations of fraud may be based upon information and belief only when "facts are peculiarly within the opposing party's knowledge." *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). And even then, "the allegations must be accompanied by a statement of the facts upon which the belief is founded." *Luce v. Edelstein*, 802 F.2d 49, 54 n.1 (2d Cir. 1986). Here, relators have failed to particularize the basis for their belief. Like the complaint this Court rejected in *Wood*, the amended complaint fails to definitively assert that even one single allegedly false claim was actually submitted to the Government. *See Wood*, 328 F. App'x at 750.

## IV. RELATORS' CLAIMS ARE PARTIALLY TIME-BARRED.

Relators' claims that predate September 9, 2005 must also be dismissed for violating the FCA's statute of limitations.

A civil FCA action must be commenced within six years of the alleged violation. 31 U.S.C. § 3731(b)(1). This action was commenced when relators filed their complaint under seal on April 18, 2008. (J.A. 3.) But that complaint was never served. (*See* J.A. 4.) Instead, after the Government declined to intervene, relators served an amended complaint on September 9, 2011. (*Id.*)

The amended complaint does not relate back to the date of the filing of the original complaint under FRCP 15(c)(1)(B) because the original complaint was

58

filed under seal and never served on DHL, thus depriving DHL of the requisite notice of the complaint that justifies relation back under Rule 15(c)(1)(B). *See U.S. v. The Baylor Univ. Med. Ctr.*, 469 F.3d 263, 270 (2d Cir. 2006). Nor does the FCA's statute of limitations permit a *relator's* amended complaint to relate back to the complaint under Rule 15(c)(1)(A). The FCA expressly states that any amended complaint by the *Government* relates back to the original complaint – but it specifically omits relators. *See* 31 U.S.C. § 3731(c).

Accordingly, relators' FCA claims that predate September 9, 2005 – six years from when the amended complaint was served on September 9, 2011 – are time-barred.

## CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed, and the amended complaint should be dismissed with prejudice.

Dated:      January 14, 2013
               Buffalo, New York

                           **CONNORS & VILARDO, LLP**

                           /s/ Terrence M. Connors
                           Terrence M. Connors, Esq.
                           James W. Grable, Jr., Esq.
                           Attorneys for Defendants
                           1000 Liberty Building
                           Buffalo, New York 14202
                           (716) 852-5533
                           tmc@connors-vilardo.com
                           jwg@connors-vilardo.com

## ADDENDUM

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains __13,979__ words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared using a proportionately spaced, serif font, using Microsoft

Office Word 2010 and Times New Roman 14 pt font.

Dated:          January 14, 2013
                Buffalo, New York

                                CONNORS & VILARDO, LLP

                                /s/ Terrence M. Connors
                                Terrence M. Connors, Esq.
                                James W. Grable, Jr., Esq.
                                Attorneys for Defendants-Appellees
                                1000 Liberty Building
                                424 Main Street
                                Buffalo, New York 14202
                                (716) 852-5533
                                tmc@connors-vilardo.com
                                jwg@connors-vilardo.com

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
===========================================
The United States of America
              *ex. rel.*
Kevin Grupp and Robert Moll,

                        Plaintiffs-Appellants,

                                          **USCA Docket No. 12-3829**

              vs.

DHL Express (USA), Inc.;  DHL Worldwide
Express, Inc. (former name of DHL Express (USA),
Inc.); and DPWN Holdings (USA),
Inc.; (f.k.a. DHL Holdings (USA), Inc.),

                        Defendants-Appellees.
===========================================

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2013, I caused the foregoing Brief

on Appeal to be electronically filed with the Clerk of the District court using

its CM/ECF system, which would then electronically notify the following

CM/ECF participants on this case:  John L. Sinatra, Jr., Esq., and Daniel C.

Oliverio, Esq., (counsel for plaintiffs-appellants) and Joshua P. Waldman,

Esq. (counsel for United States).

                         /s/ Terrence M. Connors
                        Terrence M. Connors, Esq.
                        James W. Grable, Jr., Esq.
                        CONNORS & VILARDO, LLP
                        Attorneys for Defendants
                        1000 Liberty Building
                        Buffalo, New York  14202
                        716-852-5533
                        tmc@connors-vilardo.com
                        jwg@connors-vilardo.com